# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ILLINOIS INSTITUTE OF TECHNOLOGY; JOHN KORAH | Civil Action No. 16-8685 |
| *Plaintiffs*, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | Administrative Procedure Act Case |
| THE UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; JEH C. JOHNSON, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY; LEÓN RODRÍGUEZ, DIRECTOR, U.S. CITIZENSHIP & IMMIGRATION SERVICES; DONALD NEUFELD, ASSOCIATE DIRECTOR, SERVICE CENTER OPERATIONS MARK J. HAZUDA, DIRECTOR, NEBRASKA SERVICE CENTER | |
| in their official capacities, | |
| *Defendants*. | |

## INTRODUCTION

1.     Plaintiffs bring this action to challenge the United States Citizenship and Immigration Service's (USCIS) improper denial of the Illinois Institute of Technology's (IIT) Form I-140, Petition for Immigrant Worker (hereinafter "petition") on behalf of Dr. John Korah. IIT's petition sought to classify Dr. Korah as an employment-based immigrant, specifically an outstanding researcher in computer

science, and especially in the interdisciplinary and emergent field of computational social science, in accordance with 8 U.S.C. § 1153(b)(1)(B).[1]

2.   IIT, Dr. Korah, and the United States are being prejudiced by USCIS's action because Dr. Korah's nonimmigrant status prevents him from applying for certain grants that would be of benefit not only to his area of expertise, but also to the United States. This is true not only because some of the grants would come directly from the U.S. government, but also because some of his work has been specifically on behalf of the Department of Homeland Security.

3.   Plaintiffs are without adequate remedy at law and Defendants' conduct has caused and will continue to cause irreparable harm absent injunctive relief. Each day that Dr. Korah is not a permanent resident is a day he is ineligible for funding that would help advance research in an academic field of great interest to many sectors outside traditional academic circles, particularly U.S. government agencies and the U.S. military. Each day that USCIS's impermissible denial stands is a day in which educational institutions, such as IIT, and highly-qualified foreign nationals, such as Dr. Korah, have less trust in the predictability and fairness of the immigration process. USCIS fees for immigration benefits are substantial. No applicant should have to pay so much for a decision that is arbitrary and capricious and without observance of procedure required by law.

---

[1] The outstanding professor/researcher classification is commonly referred to as EB1B by practitioners and E12 by USCIS.

4.     This action arises under the Administrative Procedure Act (APA), 5 U.S.C. § 551, *et seq.*, the Immigration and Nationality Act (INA) of 1990, 8 U.S.C. § 1101, *et seq.*, as amended, and the regulations of the former Immigration and Naturalization Service, now the USCIS, 8 C.F.R § 1.1, *et seq.*

5.     The allegations set forth in this complaint show that, in denying IIT's petition, USCIS (1) misconstrued federal laws and regulations; (2) ignored large and material portions of the submitted evidence; (3) impermissibly imposed novel and substantial evidentiary standards; and (4) failed to follow its own adjudicatory procedures.

6.     IIT seeks a declaration that USCIS's decision violated the APA because its action, findings and conclusions were (1) arbitrary and capricious, an abuse of discretion, and not in accordance with law; and (2) without observance of procedure required by law. As a result of USCIS's improper acts, the Court should set aside as unlawful USCIS's decision.

7.     Plaintiffs also ask the Court to award injunctive relief, attorneys' fees, and any other relief the Court deems appropriate in this matter. As is evidenced by the allegations of this Complaint, Plaintiffs are without adequate remedy at law and Defendants' conduct has caused and will continue to cause irreparable harm absent injunctive relief.

## JURISDICTION AND VENUE

8.    Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331, as a civil action arising under the laws of the United States. Declaratory and injunctive relief is sought pursuant to 28 U.S.C. §§ 2201-02.

9.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because Defendants are officers or employees of the United States or agencies thereof acting in their official capacities. A substantial part of the events or omissions giving rise to the claims occurred in this district, and Plaintiffs IIT and Dr. Korah reside in this district. In addition, no real property is involved in this action.

## PARTIES

10.   Plaintiff IIT is a non-profit university organized and operated exclusively for educational purpose, and is the petitioner in the petition, which is the subject of this Complaint. IIT is located in Chicago, Illinois.

11.   Plaintiff Dr. Korah is a Research Assistant Professor with the Department of Computer Science at IIT, and is the beneficiary of the petition, which is the subject of this Complaint. Dr. Korah is an Indian national, and resides in Chicago, Illinois.

12.   Defendant Jeh C. Johnson is being sued in his official capacity as the Secretary of the Department of Homeland Security (DHS). Defendant Johnson is charged with the administration of the USCIS and implementing the INA. 8 C.F.R. §2.1. He is further authorized to delegate such powers and authority to subordinate

4

employees of DHS pursuant to 8 U.S.C. §1103(a) and has specifically delegated his authority to adjudicate I-140 petitions to USCIS.

13. Defendant León Rodríguez is being sued in his official capacity as Director of USCIS and is the official generally charged with supervisory authority over all operations of the USCIS with certain specific exceptions not relevant under the facts asserted herein. 8 C.F.R. §103.1(g)(2)(ii)(B). Within DHS, USCIS is the agency charged with the duty to adjudicate Plaintiffs' petition, which is the subject of this Complaint.

14. Defendant Donald Neufeld is being sued in his official capacity as Associate Director of Service Center Operations and is the official generally charged with supervisory authority over all operations at the four USCIS service centers, including the one located in Lincoln, Nebraska. IIT's petition was adjudicated by the Nebraska Service Center (NSC).

15. Defendant Mark J. Hazuda is being sued in his official capacity as Director of the Nebraska Service Center and is the official generally charged with supervisory authority at the NSC.

## PROCEDURAL AND LEGAL BACKGROUND

16. On August 24, 2015, IIT filed a petition seeking to classify Dr. Korah as an employment-based immigrant, specifically an outstanding researcher in computer science, and especially in the interdisciplinary and emergent field of computational social science, in accordance with 8 U.S.C. § 1153(b)(1)(B).

5

17.    On September 21, 2015, USCIS issued a Notice of Intent to Deny ("NOID") IIT's petition, attached as Exhibit A. IIT responded to the NOID on October 16, 2015, further articulating the initially submitted evidence, providing additional rebuttal evidence, and arguing that USCIS misconstrued federal statutory and regulatory requirements, ignored large and material portions of the submitted evidence, impermissibly imposed novel and substantial evidentiary standards, and failed to follow its own adjudicatory procedures. *See Id.*

18.    On October 26, 2015, USCIS issued a Decision (hereinafter "denial"), denying IIT's petition. USCIS's denial constitutes final agency action. *See Darby v. Cisneros*, 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (U.S., 1993) ("Federal courts do not have the authority to require a plaintiff to exhaust available administrative remedies before seeking judicial review under the APA, where neither the relevant statute nor agency rules specifically mandate exhaustion as a prerequisite to judicial review.")

19.    *Outstanding professors or researchers* is one of three classifications of priority workers under the first-preference category of employment-based visas. 8 U.S.C. § 1153(b)(1). The other two classifications of priority workers under 8 U.S.C. § 1153(b)(1) are *aliens with extraordinary ability*[2] and *certain multinational executives and managers*.[3] *Id.*

---

[2] The extraordinary ability classification is commonly referred to as EB1A by practitioners and E11 by USCIS.
[3] The multinational executives/managers classification is commonly referred to as EB1C by practitioners and E13 by USCIS.

20. Foreign nationals with extraordinary ability are held to the highest standard in terms of qualifications. *See* 8 U.S.C. § 1153(b)(1)(A)(i) (defining an alien of extraordinary ability as one who has "extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by *sustained national or international acclaim* and whose achievements have been recognized in the field through *extensive documentation*") (emphasis added); *see* 8 U.S.C. § 1153(b)(1)(A)(iii) (requiring that the entry of an alien of extraordinary ability into the United States "substantially benefit prospectively the United States"); *see* 8 C.F.R. §204.5(h)(2) (defining extraordinary ability as "a level of expertise indicating that the individual is *one of that small percentage who have risen to the very top* of the field of endeavor," and requiring "evidence that the alien has *sustained* national or internal *acclaim* and that his or her achievements have been recognized in the field of expertise") (emphasis added).

21. Unlike *extraordinary ability*, *outstanding professors and researchers* is not a term defined in the statute or federal regulations. *See* 8 U.S.C. § 1153(b)(1)(B); 8 C.F.R. §§ 204.5(h) and 204.5(i). Only the terms *academic field* and *permanent* are defined in the context of the classification for outstanding professors/researchers. 8 C.F.R. § 204.5(i)(2) ("Academic field means a body of specialized knowledge offered for study at an accredited United States university or institution of higher education;" the term *permanent* is not relevant under the facts asserted herein).

22. USCIS has interpreted the regulatory definition of academic field as implying that the field must be "larger than a very small area of specialization in

which only a single course is taught or is the subject of a very specialized dissertation." Adjudicator's Field Manual (AFM)[4] Chapter 22.2(i)(2)(A). "As such, it would be acceptable to find the alien is an outstanding professor or researcher in the claimed field (e.g., particle physics vs. physics in general), as long as the petitioner has demonstrated that the claimed field is a body of specialized knowledge offered for study at an accredited United States university or institution of higher education." *Id.*

23. **The findings and rationale of the denial copied the language of the NOID with only the three following modifications**:

A. The NOID pointed out that IIT submitted "myriad names in lists of conference committees" but did not identify Dr. Korah in these lists, noting that it is IIT's responsibility to "identify (highlight, underline, or mark) the alien's name in such lists." Exhibit A at 3. This statement was removed from the subsequent denial (*see* Exhibit B), after IIT addressed it in its response to the NOID, resubmitting the lists with Dr. Korah's name highlighted, and submitting additional evidence of Dr. Korah's participation, either individually or on a panel, as the judge of work of others in the same or allied academic field;

B. The NOID stated that "all the [expert] letters discuss [Dr. Korah's] work broadly without mentioning his papers or how he has directly contributed to the

---

[4] **The AFM is one of several types of USCIS policy materials**. *See* AFM Chapter 3.4(a) (listing "Field and Administrative Manuals" as examples of policy materials). "**Policy material is binding on all USCIS officers** and must be adhered to unless and until revised, rescinded or superseded by law, regulation or subsequent policy, either specifically or by application of more recent policy material." *Id.*

field." *Id.* at 3. This statement was removed from the subsequent denial (*see* Exhibit B), after IIT addressed it in its response to the NOID, pointing out that all of the submitted letters specifically identify Dr. Korah's contributions and provide specific examples of how those contributions have influenced the field of computer science; and

C. The denial contained one additional statement addressing only one of the many pieces of rebuttal evidence submitted by IIT in response to the NOID: download data from ResearchGate, a social networking site for scientists and researchers to share publications, ask and answer questions, obtain statistics about their work, and find collaborators. *See* Exhibit B at 3.

24. **USCIS has adopted the two-part test established by the Ninth Circuit in** ***Kazarian v. U.S. Citizenship and Immigration***, 596 F.3d 1115 (9th Cir., 2010)[5,6] as part of its adjudicatory policy for evaluating the evidence submitted in support of petitions seeking the outstanding professor/researcher classification. *See* AFM Chapter 22.2(i)(2)(A).

25. **With respect to Part One of outstanding professor/researcher case analysis, USCIS policy states**: "The determination in Part One is limited to determining whether the evidence submitted with the petition is comprised of *at least*

---

[5] The classification at issue in *Kazarian*, 8 U.S.C. § 1153(b)(1)(A) (extraordinary ability), requires qualifying evidence under three criteria, whereas **the classification at issue in this matter, 8 U.S.C. § 1153(b)(1)(B) (outstanding professor/researcher), requires qualifying evidence under only <u>two</u> criteria.**
[6] The American Immigration Council and the Association of International Educators, in an amicus brief in support of rehearing, challenged USCIS's interpretation of its governing regulations and the Ninth Circuit's approval of this interpretation in *Kazarian*. The American Immigration Lawyers Association has expressed opposition to the interpretations contained in USCIS's post-*Kazarian* policy guidance.

*two* of the six regulatory criteria listed at 8 C.F.R. 204.5(i)(3)(i) . . . While USCIS officers should objectively consider the quality and caliber of the evidence as required by the parameters of the regulations to determine whether a particular regulatory criterion has been met, *USCIS officers should not make a determination relative to the alien's claimed international recognition in Part One of the case analysis.*" *Id.* (emphasis added).

26.   In the denial, **USCIS made the following findings in Part One of the case analysis**:

A.  IIT did not meet the criterion at 8 C.F.R. § 204.5(i)(3)(i)(C) ("Published material in professional publications written by others about the alien's work in the academic field, hereinafter "professional publications"). *See* Exhibit B at 2. USCIS supported its conclusion with the following statements:

i.   *Engineering Vistas* is not a professional publication, but rather a "self-promotional alumni newsletter," and Dr. Korah's work was not discussed in this publication. *Id.*;

ii.   DHS newsletters are not professional publications because "the *only* function of such media outlets is to *disseminate information* and therefore cannot be considered a *comprehensive analysis* of the alien's research *as discussed by an independent scholar* in a professional publication (i.e., *journal* or *monograph*) that would be *cited by researchers* in the field." *Id.* (emphasis added).

B. IIT met the criterion at 8 C.F.R. § 204.5(i)(3)(i)(D) ("Evidence of the alien's participation, either individually, or on a panel, as the judge of the work of others in the same or allied academic field," hereinafter "judge of the work of others"). *See Id* at 3.

C. IIT did not meet the criterion at 8 C.F.R. § 204.5(i)(3)(i)(E) ("Evidence of the alien's original scientific or scholarly research contributions to the academic field," hereinafter "original contributions"). *See Id*. USCIS supported its conclusion with the following statements:

    i.   The submitted letters of support written by experts in the field did not show the authors know the alien primarily through his research and thus were accorded "much less weight." *Id*. ("Dr. Santos is the alien's supervisor and collaborator; Dr. Cybenko has 'known [the alien] for over six years' and worked with him on a project for US CBP; Dr. Rickman is familiar with the alien through his '*interactions with [the alien] at a research meeting* at the University of Texas at El Paso; Dr. Thuraisingham personally knows the alien; Mr. Sciarretta was a '*professional colleague*'; Mr. Krause and Dr. Nguyen are former collaborators") (emphasis added).

    ii.   "[Dr. Korah] appears to be an important member to his team, in particular Dr. Santos, but the evidence [did] not show that [Dr. Korah] is recognized outside of his current and former collaborators," adding that "[l]ess persuasive is that of the 49 citations of [Dr. Korah's] work only 13 are independent[.]" *Id*.

iii. "[Dr. Korah] is *not first author* of any of his cited papers, and of the published papers in Dr. Santos's team he is usually fifth author." *Id.* (emphasis added).

iv. "[T]he downloading of any work has no probative value since there is no way of measuring a work's influence on the field, the number of those who are downloading the alien's work, and, more importantly, who they are." *Id.* (emphasis added).

D. IIT met the criterion at 8 C.F.R. § 204.5(i)(3)(i)(F) ("Evidence of the alien's authorship of scholarly books or articles (in scholarly journals with international circulation) in the academic field," hereinafter "scholarly publications"). *See Id.*

27. **With respect to Part Two of the outstanding professor/researcher case analysis, USCIS policy states**: "Second, USCIS officers should evaluate the evidence *together* when considering the petition *in its entirety* for the final merits determination regarding the *required high level of expertise* for the immigrant classification. . . . In Part Two of the analysis in each case, you *must* consider *all of the evidence* to make a final merit determination of whether or not the petitioner has, by a *preponderance of the evidence*, demonstrated that the alien is recognized internationally as outstanding *in a specific academic area*" AFM Chapter 22.2(i)(2)(A) (emphasis added).

28. In the denial, **USCIS made the following findings in Part Two of the case analysis**:

A. Dr. Korah's service as a reviewer for *Institute of Electrical and Electronics Engineers (IEEE) Transactions on Computational Social Systems*, simply referred to as "Dr. Santos's journal," does not show Dr. Korah is recognized internationally as outstanding in his specific academic area. Exhibit B at 3, 4. In support of this conclusion, USCIS stated that "the evidence does not prove the alien's participation in the widespread peer-review process (a routine process in the field relying on many scientists) *exceeds that of other researchers* or reflects international recognition. Such recognition is more commonly associated with *service on an editorial board of a prestigious journal* or as a *general chair of a professional scientific conference.*" *Id.* at 4 (emphasis added).

B. Dr. Korah's work as Senior Researcher in the $1.44M project entitled "Assessment Study for Test and Evaluation of Biometric Systems and their Inter-operability with Border Security and Defense Systems," sponsored by the Office of the Secretary of Defense of the U.S. Department of Defense, simply referred to as "the alien's work with Mr. Sciarreta and Dr. Santos," does not show Dr. Korah is recognized internationally as outstanding in his specific academic field. *Id.* In support of this conclusion, USCIS stated that "USCIS does not view daily duties of evaluation of research and 'identifying potential solutions' as judging the work of others." *Id.*

C. Dr. Korah's "published conference papers and articles with scholarly journals in the field" do not show Dr. Korah is recognized internationally as outstanding in his specific academic field. *Id.* USCIS supported its conclusion,

13

stating that "publications are *not as reliable a measurement* in determining a researcher's influence on the academic field *as frequent, independent citations of his work*. Indeed, USCIS considers the *number* of *independent* citations to be an objective, reliable gauge in determining the alien's *original* research contributions to the academic field. *Publishing alone* may serve as evidence of *originality*, but it is difficult to determine a published work's importance or influence if there is little to no evidence that other scholars have relied on a researcher's findings. With that in mind, USCIS has determined that the number of independent citations (13) of the alien's work does not establish that he is recognized internationally *as outstanding.*" *Id* (emphasis added).

29. In the denial, USCIS concluded its Part Two analysis by simply stating "Therefore, USCIS does not find the alien to be *an outstanding professor or researcher.*" *Id.* (emphasis added).

## FACTUAL ALLEGATIONS

30. IIT submitted ample evidence showing that Dr. Korah is recognized internationally as outstanding in the field of computer science, and especially in the interdisciplinary and emergent field of computational social science. Such evidence included, but was not limited to, three of the types of initial evidence—only two of which are required—listed at 8 C.F.R. § 204.5(i)(3)(i).

31. One of Dr. Korah's main areas of research interest is large and dynamic information search. In this area, Dr. Korah has worked with search engines to ensure that they can efficiently gather data within given search parameters. His research

has provided the field with methods of searching not just words, but also images for relevance. His specific focus has been on search algorithms for real time data such as information from dynamic databases and social media.

32.    Dr. Korah's work has also focused on modeling and simulation for network centric environments (NCEs) with specific application for the Network Centric Operations/Warfare (NCO/NCW). In response to the changing face of warfare as seen with low intensity, high tempo asymmetric warfare practiced by state actors and insurgent groups, the Department of Defense (DoD) embarked on a program of force transformation termed NCO/NCW. This fundamental shift in warfighting philosophy looked at utilizing modern advances in communications, sensor technology and information systems to enable the soldiers on the field, commanders off the field, and support groups, to seamlessly access and share real-time information. Dr. Korah helped develop modeling techniques for large NCEs and demonstrated how graph theoretic methods, probabilistic reasoning techniques, and network performance tools, can be leveraged to undertake analysis of NCO/NCW networks. This work was sponsored by the Air Force Office of Scientific Research (AFOSR).

33.    Throughout his career, Dr. Korah's research has been funded by multiple agencies in the DoD, such as AFOSR and the Office of Naval Research (ONR) and by agencies within DHS. He has also been offered tenure-track faculty positions at other academic institutions, one of them, offering him a package of in-cash and in-kind resources valued at $303,298.

34.   Dr. Korah's work during his Ph.D. program was of such great interest to the field, that he was recruited to serve as a Visiting Assistant Professor in the Department of Computer Science at The University of Texas at El Paso (UTEP), as well as Associate Director of the National Center for Border Security & Immigration (NCBSI), a Center of Excellence established by DHS and the Institute of Defense & Security. In this position, Dr. Korah assisted numerous government agencies in areas such as cybersecurity, cross border disease spread models and modeling and simulation for Test & Evaluation (T&E). He also helped lead the $5OOK Checkpoint study for the US Office of Border Patrol (OBP) as Co-Principal Investigator.

35.   At UTEP's Institute of Defense & Security, Dr. Korah participated in a $1.44M study sponsored by the Test Resource Management Center (TRMC), the main organization for T&E within the Office of Secretary of Defense. The main objective of the study was to advise TRMC on the areas in biometrics and systems interoperability T&E, which are critical to the current and future readiness of the DoD.

36.   Dr. Korah has also sought to use computational modeling to provide insights into complex problems involving such varied social interactions as group formation, information sharing, decision-making in organizations, and even population migration during epidemics. Using a novel framework called Culturally Infused Social Networks (CISNs) to model the continuously changing inter-clan relationships in Somalia during the 2006 Somali Civil war, Dr. Korah and his collaborators at UTEP and Dartmouth College were able to demonstrate how

"culture" can be embedded within a social network to provide a more nuanced explanation of the underlying social dynamics. This research, which was sponsored by DoD's Defense Threat Reduction Agency (DTRA), addressed one of the great challenges of mapping descriptive and subjective notions of culture into fixed quantities and probabilities in computational social science models.

37. Dr. Korah has served as Program Committee (PC) member for the International Conference on Agents and Artificial Intelligence (ICAART) in 2014 (France), 2015 (Portugal), and 2016 (Italy); and for the ASE International Conference on Social Computing in 2013 and 2014. Through his many contributions to the computer science field, Dr. Korah was selected as PC member and entrusted with the responsibility of reviewing, selecting, and editing submitted papers to ensure they met each conference's rigorous academic standards.

38. Dr. Korah has served as Program Co-Chair of ParSocial 2016, the *first* IEEE workshop on parallel and distributed processing for computational social systems, which is also part of the highly prestigious IEEE International Parallel and Distributed Processing Symposium (IPDPS), a top-tier conference in the field of computer science.

39. Dr. Korah has served as a reviewer for the *Journal of Computational Science*, a top-tier journal in the computer science field, published in the Netherlands. Further, Dr. Korah has served as a dissertation committee member. In this role, Dr. Korah judged the work of a graduate student toward his M.S. degree in Computer Engineering.

40. Apart from publishing in top-tier journals and presenting his work at several prestigious conferences in his field, Dr. Korah and collaborators' book chapter entitled "I-FGM as a Real Time Information Retrieval Tool for E-Governance," was selected for publication in *Social and Organization Developments through Emerging E-Government Applications: New Principles and Concepts*, a book aimed at researchers and other professionals interested in the study and development of e-government in the local, national, and worldly context.

41. Dr. Korah is currently employed as Research Assistant Professor in the Department of Computer Science at IIT. In this position, he continues to assist the U.S. government with several important projects aimed at improving cybersecurity, as well as improving the tools used in combat operations.

**FIRST CLAIM FOR RELIEF**
**Violation of APA for Agency Action that is**
**Arbitrary and Capricious, an Abuse of Discretion,**
**and Not in Accordance with Law**
**5 U.S.C. §§ 702, 706(2)(A)**

42. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

43. **Nowhere in the denial's analysis did USCIS mention, much less discuss, Dr. Korah's specific academic area**. *See* Exhibit B. According to 8 U.S.C. § 1153(b)(1)(B), an outstanding professor or researcher "is recognized internationally as outstanding *in a specific academic area*[.]" Similarly, the regulations at 8 C.F.R. § 204.5(i)(3) refer to "[e]vidence that the professor or researcher is recognized as outstanding *in the academic field specified in the petition*." Because USCIS failed to

18

evaluate the evidence in the context of Dr. Korah's specific academic field, USCIS's denial of IIT's petition was arbitrary and capricious, an abuse of discretion, and not in accordance with the law.

44. **In reaching its conclusions, USCIS ignored large and material portions of the submitted evidence, as follows**:

A. In finding that IIT failed to meet the criterion at 8 C.F.R. § 204.5(i)(3)(i)(C) (professional publications criterion), USCIS ignored a piece of material evidence submitted in support of this criterion, namely, relevant pages from the 2012 Year 4 Progress Report for the National Center for Border Security and Immigration (NCBSI), listing Dr. Korah as Associate Director of the NCBSI and discussing two of the research efforts led by Dr. Korah and collaborators in the capacity of faculty investigators: Intent-Driven Behavioral Modeling of Cross-Border Epidemic Spread, and Checkpoint Analysis & Assessment.

B. In finding that IIT failed to meet the criterion at 8 C.F.R. § 204.5(i)(3)(i)(E) (original contributions) and failed to show that Dr. Korah is internationally recognized as outstanding in his academic field, USCIS ignored the following pieces of material evidence:

i. most of the letters from experts in Dr. Korah's and allied academic fields, all of which specifically identify Dr. Korah's contributions and provide specific examples of how those contributions have influenced his specific academic field;

ii.     Dr. Korah's conference publications, including information about the importance of the conferences, such as rankings of, and paper acceptance rates for, various conferences;

iii.     evidence that a good amount of Dr. Korah's work is within a highly interdisciplinary and emergent academic field, e.g., evidence that *IEEE Transactions on Computational Social Systems* was first published in March 2014;

iv.     evidence that Dr. Korah's work has been performed in collaboration with, and funded by, U.S. government agencies, such as the Departments of Defense and Homeland Security;

v.     evidence that a significant portion of Dr. Korah's work involves interests and applications not commonly the subject of traditional computer science journals and events;

vi.     evidence showing that citations are not a reliable measure of a published work's importance, and hence its author's contributions to the field, when said work represents an outstanding contribution mainly to an interdisciplinary or emergent field, such as computational social science;

vii.     evidence of Dr. Korah's service as the judge of the work of others in the same or allied academic field, e.g., in his role as Program Committee Member for various conferences, and as Co-Chair for the *first* IEEE Workshop

on Parallel and Distributed Processing for Computational Social Systems (ParSocial 2016);

viii.    evidence that Dr. Korah has served as paper reviewer for several top-tier computer science publications, such as the *Expert Systems with Applications* (UK), and *Applied Intelligence* (Netherlands), and as committee member for a graduate dissertation in Computer Engineering, further demonstrating Dr. Korah's service as a judge of the work of others in the same or allied academic field.

ix.    two job offer letters showing that Dr. Korah has been offered tenure-track faculty positions at other academic institutions, one of them offering a package of in-cash and in-kind resources valued at $303,298;

x.    evidence that Dr. Korah has been an invited speaker at various academic events, e.g., gave an invited talk entitled "Dealing with the Challenges of Velocity and Veracity in Data Analytics," at the Virginia Commonwealth University (VCU) in March 2015, and served as panelist at the DHS Science Conference: Fifth Annual University Network (2011);

xi.    evidence that, in his capacity as Associate Director of the National Center for Border Security and Immigration (NCBSI), Dr. Korah reviewed research proposals and assessed research results, providing feedback to the director of NCBSI and the project Principal Investigators;

xii.    evidence that order of authorship is not a reliable measure of specific contributions, as conventions vary greatly across disciplines, institutions, publications, and throughout time;

xiii.    other evidence of the importance of Dr. Korah's original and scholarly contributions to his academic field, e.g., the fact that Dr. Korah and collaborators' book chapter entitled "I-FGM as a Real Time Information Retrieval Tool for E-Governance," was selected for publication in *Social and Organization Developments through Emerging E-Government Applications: New Principles and Concepts*, a book aimed at researchers and other professionals interested in the study and development of e-government in the local, national, and worldly context;

xiv.    other evidence of the importance of Dr. Korah's work, e.g., in improving national security and disaster relief, as shown by his successful modeling of political instability in Somalia, and of population dynamics during the 2009 H1N1 epidemic in Mexico, subjects of considerable interest within Dr. Korah's interdisciplinary and emergent academic area;

45.    **In reaching its conclusions, USCIS misconstrued the evidentiary criteria listed in 8 C.F.R. §204.5(i)(3)(i) and impermissibly imposed novel and substantial evidentiary standards**, as described in the following allegations.

46.    **USCIS placed undue emphasis on Dr. Korah's citation history** and failed to give due consideration to all of the submitted evidence showing Dr. Korah's original contributions to, and international recognition as outstanding in, the field of

22

computer science, and especially in the interdisciplinary field of computational social science.

47. **There is no support in the law or regulations for the position that** *frequent, independent* **citations are a necessary and sufficient condition for the conclusion that an alien has made *original* contributions to the academic field**. In the context of Part One of the outstanding professor/researcher cases analysis, the AFM states with regards to the original contributions criterion: "*Possible* items that could satisfy this criteria, include *but are not limited to*: ·Citation history/patterns for the alien's work, as evidenced by number of citations, as well as an examination of the impact factor for the journals in which the alien publishes." AFM Chapter 22.2(i)(2)(A) (emphasis added).

48. It is unfair and unreasonable to hold outstanding professors and researchers in interdisciplinary fields, who are carrying out research of great national and international importance, to the same standard as professors and researchers in more traditional fields for which publication and citation patterns have stabilized over time. As demonstrated by evidence IIT submitted in response to the NOID, citations follow a pattern of growth over time in any given academic field, but where there are few publications, this growth takes much longer. In the case of interdisciplinary fields, citations take an average of 13 years to catch up with other traditional fields. Emerging fields present a similar pattern.

49. **USCIS failed to consider Dr. Korah's number and quality of publications in determining that IIT failed to meet the original contributions criterion**. By its own

admission, USCIS should have considered these factors in determining whether IIT met the original contributions criterion in Part One of its case analysis. *See* Exhibit B at 3. Instead, USCIS based its determination on improperly drawn conclusions relating to international recognition. *See* Chapter 22.2(i)(2)(A). (prohibiting adjudicators from making determinations relative to a beneficiary's claimed international recognition in Part One of the outstanding professor/researcher case analysis).

50. Moreover, the AFM clearly states that citation patterns should be evaluated in conjunction with the "impact factor for the journals in which the alien publishes." *See Id*. In response to the NOID, IIT submitted metrics for journals in which Dr. Korah has published, but this evidence was entirely ignored in the denial, further showing that USCIS's actions were arbitrary and capricious.

51. **USCIS incorrectly concluded that "the downloading of any work has no probative value**, maintaining that there is no way of measuring a work's influence on the field, the number of those who are downloading the alien's work, and, more importantly, who they are." ResearchGate does in fact provide its users with information about the identity, country, and institutional affiliation, if any, of ResearchGate users who have read their work. These facts can reasonably be used to determine a work's influence on an academic field, and should not be categorically dismissed as lacking probative value.

52. **The AFM also suggests expert opinion letters as possible items that could satisfy the original contributions criterion**: "Since scholarly work tends to be

24

specialized and to be expressed in arcane and specialized language, USCIS officers *should* take into account the probative analysis that experts in the field may provide in giving an assessment of the alien's original contributions." AFM Chapter 22.2(i)(2)(A) (emphasis added). It is also worth noting that the AFM only mentions citations in the context of Part Two of extraordinary ability case analysis but not once in the context of Part Two of outstanding professor/researcher case analysis.

53. **There is no requirement that advisory opinions be from independent experts in order for them to be considered objective**. In fact, the Board of Immigration Appeals (BIA) has repeatedly held that testimony should not be disregarded simply because it is "self-serving." *See e.g.*, *Matter of S-A-*, 22 I&N Dec. 1328, 1332 (BIA 2000) (citing cases). In addition, nowhere does the AFM even consider the relationship of experts in the field to the petitioner or beneficiary. *See* AFM Chapter 22.2(i)(2)(A).

54. In discussing the probative analysis that experts in the field may provide in opinion letters, the AFM states the following: "not all expert letters provide such [probative] analysis. Letters that specifically articulate how the alien has contributed to the field and its impact on subsequent work add value. *Letters that lack specifics and simply use hyperbolic language do not add value*, and are not considered to be probative evidence that may form the basis for meeting this criterion." *Id.* (emphasis added).

55. **None of the expert letters submitted in support of IIT's petition lack specifics or simply use hyperbolic language**. All of the letters specifically identify Dr.

25

Korah's contributions and provide specific examples of how those contributions have influenced the field of computer science. Further, a considerable amount of corroborative evidence was provided in support of the assertions made in these letters. The intention in including these letters was to assist USCIS in its assessment of Dr. Korah's original and scholarly contributions to his academic field, not to serve as the only evidence of said contributions.

56.    **USCIS failed to consider the fact that Dr. Korah's particular research area, due to its interdisciplinary and emerging nature, is currently occupied by relatively small and closely knit research communities** where academic and industry researchers attend the same conferences and often receive funding from the same agencies. While this leads to opportunities for making acquaintances, such acquaintanceship cannot be viewed as indicative of bias in their assessments of Dr. Korah's contributions to the field.

57.    **Many of the experts dismissed by USCIS as non-independent are actually independent, as they have never collaborated with Dr. Korah or had any other form of close professional relationship with Dr. Korah**. Coworker is not synonymous with professional colleague, a term that includes every professional in the same discipline or industry. That an expert personally met Dr. Korah on one occasion, or simply identifies as one of Dr. Korah's many professional colleagues, does not preclude the possibility that the expert knows Dr. Korah *primarily* through Dr. Korah's work.

58.    The letters from the following experts, who have never collaborated or otherwise worked with Dr. Korah, and should therefore be considered independent,

were impermissibly disregarded under a presumption of bias: (1) Dr. Rickman; (2) Dr. Thuraisingham; (3) Dr. Liu; (4) Dr. Santhi; (5) Dr. Anane; (6) Dr. Zhan; (7) Dr. Weerakoddy; and (8) Dr. van den Herik. This fact was reiterated by IIT in response to the NOID but was entirely ignored by USCIS in its denial. USCIS's failure to consider the probative analysis offered by any of the experts constitutes arbitrary and capricious agency action.

59. **There is no requirement that the beneficiary be first author in any of his co-authored publications in order to claim credit for them. Moreover, the order of authorship is far from being a standard and reliable measure of specific contributions**, as conventions of scientific authorship vary greatly across disciplines, institutions, publications, and also throughout time. As IIT established in response to the NOID, what is consistent across academic disciplines today is a general consensus that only those persons who have made significant or substantial contributions to a study should be listed as co-authors, and that anyone who has made less than significant or substantial contributions should be included only in the acknowledgements. Further, all co-authors are generally held jointly and severally responsible for the content of their publications unless they disclose individual contributions.

60. In Dr. Korah's case, he is often listed after Dr. Eunice Santos and Dr. Eugene Santos, Jr., the lead principal investigators of many of the studies to which he has contributed. In the case of much larger collaborations, such as those involving multiple institutions (e.g. I-FGM papers), the same standard applies, pushing Dr. Korah's name farther down the list. Therefore, in many instances, the order of

authorship in Dr. Korah and collaborators' publications is not a reliable indicator of Dr. Korah's level of contribution to those publications. Dr. Korah's contributions to specific publications, and to his academic field, are explained in great detail in letters provided by experts in the field and corroborated by a preponderance of the evidence submitted in support of IIT's petition.

61.  **USCIS conflated two of the six evidentiary criteria at 8 C.F.R. § 204.5(i)(3)(i), namely scholarly publications (8 C.F.R. § 204.5(i)(3)(i)(F)) and professional publications (8 C.F.R. § 204.5(i)(3)(i)(C)).** In conflating these two criteria, USCIS impermissibly imposed substantive or novel evidentiary standards, contrary to law and USCIS policy guidance instructing officers to "objectively consider the quality and caliber of the evidence as required by the parameters of the regulations to determine whether a particular regulatory criterion has been met[.]" AFM Chapter 22.2(i)(2)(A). This allegation is supported by the following:

A.  There is no requirement that material about the beneficiary's work in the academic field be in a publication the purpose of which is other than disseminating information. Professional publications are intended for experts in the field or in the industry. Traditional trade and professional publications are periodicals such as magazines and newspapers, the purpose of which is normally to disseminate information relevant to their intended audiences.

B.  There is no requirement that the published material provide a "comprehensive analysis of the alien's research," or that said analysis be provided by "an independent scholar." The regulations do require that the material include

28

the title, date, and author of the material, and any necessary translation. 8 C.F.R. § 204.5(i)(3)(i)(C). The professional publications submitted by Dr. Korah in support of this criterion contain all of the required information, and have therefore met the parameters of the regulatory description applicable to professional publications.

C. Nowhere are professional publications defined as analogous with scholarly publications, examples of which include journals or monographs that would be cited by researchers in the field. The AFM states that "the alien should establish that the circulation (on-line or in print) is *high* compared to other circulation statistics" with respect to extraordinary ability petitions, while merely stating that "the alien should establish the circulation (online or in print)" with respect to outstanding professor/researcher petitions. AFM Chapter 22.2(i)(2)(A).

62. **Applicants for the outstanding professor/researcher classification are not required to be "one of that small percentage who have risen to the very top of the field**." *See Id.* (emphasis added). Dr. Korah's direct supervisor, Dr. Santos, has been internationally recognized as a pioneer in the field of computational social science, and can properly be considered to have risen to the very top of her field, as would be required of an individual seeking to be classified as an immigrant with extraordinary ability. That Dr. Korah has been key to the success of Dr. Santos's laboratory in two locations, and has repeatedly been recognized as her co-author in various scholarly publications with international circulation, should be considered indicative of his

outstanding contributions to the field of computer science, and especially in the interdisciplinary and emergent field of computational social science.

63.   In denying IIT's petition, USCIS also failed to follow its own adjudicatory procedures, as set out in policy materials which are binding on all USCIS officers. This failure further shows that USCIS's denial was arbitrary and capricious, an abuse of discretion, and not in accordance with law.

**SECOND CLAIM FOR RELIEF**
**Violation of APA for Agency Action that is**
**Without Observance of Procedure Required by Law**
**5 U.S.C. §§ 702, 706(2)(D)**

64.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

65.   In the denial, USCIS not only impermissibly imposed substantive and novel evidentiary standards, but also failed to follow its own procedures, namely the two-part test established in *Kazarian*, and which USCIS has adopted as part of its adjudicatory policy for determining eligibility for the outstanding professor/researcher classification, by requiring that the evidence submitted in support of a given criterion be indicative of, or consistent with, international recognition in the field, a determination that must only be made in Part Two of the analysis and only with respect to the *totality* of the evidence submitted. *See* AFM Chapter 22.2(i)(2)(A).

66.   In determining that Dr. Korah did not meet the original contributions criterion in Part One of the case analysis, USCIS impermissibly made determinations

30

relative to Dr. Korah's claimed international recognition, and impermissibly disregarded the probative analysis offered by experts in the field, incorrectly claiming that the experts did not know Dr. Korah primarily through his research. *See Id.* (instructing adjudicators to "take into account the probative analysis that experts in the field may provide in opinion letters regarding the alien's contributions in order to assist in giving an assessment of the alien's original contributions" and indicating that "[l]etters that specifically articulate how the alien has contributed to the field and its imact on subsequent work add value"). In addition, as noted in response to the NOID, several of the experts were in fact independent.

67.   USCIS also failed to follow procedure required by law by impermissibly using Dr. Korah's moderate citation record as a controlling factor in both stages of the case analysis, and failing to give due consideration to all the submitted evidence showing Dr. Korah's international recognition as outstanding in the field of computer science, and especially in computational science.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue judgment in its favor and against Defendants and issue the following relief:

A.   A declaratory judgment setting aside as unlawful USCIS's denial of IIT's petition on behalf of Dr. Korah;

B.   An injunction directing USCIS to reopen and adjudicate IIT's petition, in accordance with this Court's opinion;

C.    Award reasonable costs and attorney's fees and expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), 5 U.S.C. §504, or any other applicable law;

D.    Grant such other relief as the Court may deem just and proper.

Date: September 6, 2016                    Respectfully submitted,

                                          Illinois Institute of Technology


                                          BY COUNSEL:

                                          /s/ Noelia Rodríguez-Quiñones

                                          Noelia Rodríguez-Quiñones, #6313847
                                          NANCY M. VIZER, P.C.
                                          223 W Jackson Blvd, Ste 725
                                          Chicago, IL 60606
                                          Tel: (312) 957-1755
                                          Fax: (312) 957-1760
                                          Email: nrodriguez@vizerlaw.com